Filed 1/28/26; Certified for Publication 2/4/26 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D086608 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BLF2300203) |
| DANIEL DIAZ GOMEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Anthony R. Villalobos, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Heather Monasky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Junichi P. Semitsu, Kristen Ramirez and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Daniel Diaz Gomez of taking or driving a vehicle unlawfully (count 1–Veh. Code §§ 10851, subd. (a), 666.5, subd. (a)); conspiracy to commit vehicle theft (count 2–Pen. Code § 182, subd. (a)(1)); and receiving stolen property (count 4–Pen. Code § 496, subd. (a)).  Gomez waived his right to a jury trial on certain alleged prior convictions, and his

counsel agreed to stipulate to one prior strike. The trial court sentenced Gomez to the middle term of three years–doubled by the strike to six years, on count 1; the middle term of two years–doubled to four, on count 2, stayed pursuant to Penal Code section 654; and one year on count 4, to run concurrently to count 1.

Gomez asserts that 1) both the prosecutor and his trial counsel violated the Racial Justice Act (the RJA) (Pen. Code § 745) by using an analogy of a dog drinking a slurpy left in a car on a warm day to explain the concept of circumstantial evidence to the jury; and 2) that the trial court made several errors during sentencing. We conclude Gomez has not established a claim under the RJA. The People concede, and we agree, that the matter must be remanded for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We provide a brief description of the underlying crimes, as the issues on appeal are limited to the alleged RJA violation and sentencing issues.

On September 27, 2023, a Riverside County Sheriff's deputy on patrol in a rural area of Blythe decided to check on a property that he knew to be unoccupied and targeted for theft. The deputy noticed a door to the workshop was open. As he was investigating, he heard a noise that sounded like a vehicle running and turned to see a vehicle towing a motorhome. Gomez was driving the vehicle. There was another individual in the passenger seat, and a third in the motorhome itself. The vehicle did not have a tow hitch and, instead, the motorhome was connected by an "ad hoc" rig that included two stabilizing bars later determined to have been taken from the workshop on the property. None of the three individuals owned or had permission to move the motorhome or the stabilizing bars.

2

The People charged Gomez as follows:  count 1–willfully driving or taking a vehicle (the motorhome) without consent and with intent to deprive the owner of possession of the vehicle, with an allegation that Gomez was previously convicted of qualifying prior vehicle theft offenses within the meaning of Penal Code section 666.5, subdivision (a); count 2–conspiracy to steal a vehicle; count 3–felony burglary; and count 4–misdemeanor receiving stolen property (a chain and the stabilizing bars) valued at less than $950. The People further alleged that Gomez had three strike priors, which were different offenses than those relied upon for the section 666.5 allegation in count 1.

The jury found Gomez guilty on counts 1, 2, and 4, and not guilty on count 3.  Gomez waived his right to a jury trial on the priors.  After some discussion, the prosecutor and defense counsel agreed to stipulate to one prior in exchange for dismissal of the other two.

The trial court sentenced Gomez to the middle term of three years– doubled by the strike to six years–on count 1; the middle term of two years– doubled to four years–on count 2, stayed pursuant to Penal Code section 654; and one year on count 4, to run concurrently to count 1.

Gomez filed a timely notice of appeal.

## II.    DISCUSSION

### A.    The Alleged Racial Justice Act Violation

Gomez asserts both the prosecutor and his own trial counsel violated the Racial Justice Act by using an analogy of a dog left in a car drinking a slushy on a warm day during voir dire and closing arguments.  As we explain, Gomez forfeited the argument but even if we were to consider the merits, we would conclude that neither attorney exhibited racial bias or animus or used racially discriminatory language when they discussed the dog analogy.

3

### 1.     Additional Background

Part way through voir dire, the prosecutor introduced the concept of circumstantial evidence.  He did so by presenting a screen with an image of "John the dog," and explaining:

> "What we're looking at here is John the dog.  And let's just imagine you're the owner of John.  And you're in a car with John on a hot summer—Coachella Valley summer kind of hot day.  Maybe not.  Because that wouldn't be very good for the dog if you leave him alone.  A normal warm day.  Okay.
>
> "And you leave your blue-colored slushy ice cream in the vehicle, and it was full.  And you go out, you get your groceries, and then you come back.  And you see pretty much this.  The blue slushy is, like, pretty much all eaten or drank.  Whatever you would do with it.  And you see also the dog having a similarly colored tongue suddenly as the slushy was.
>
> "So I would ask you, if Mr. Dog is at trial here, would you think that the dog is guilty?  Anyone can answer.  Yes.  I saw most of you nodding.  I haven't told you, though, that anyone has actually seen Mr. Dog drink or eat the slushy, right?  So that would be direct evidence if in that trial . . . the witness comes in and says, 'I have seen the dog lick that slushy.'
>
> "But we don't have that.  We only have information of there is a slushy and it's full.  And then you come back and it's not there anymore, and we have a blue tongue.  That is circumstantial evidence.  All right?
>
> "Often, also, the example is it's raining outside.  Someone comes inside and they're wet.  Without someone actually seeing that they were rained on, someone could still find that they probably got wet because of the rain.  All right."

4

After some further discussion, the prosecutor added:

> "So let me change it a little bit. Let's say this dog is extremely intelligent and is able to speak. And actually says, 'I didn't drink—I didn't drink.' And he testifies to it."

The prosecutor brought up the dog again later, while questioning another prospective juror. The prosecutor put the image back on the screen and suggested he had used the dog story to "make it more interesting."

The case proceeded to trial. The deputy, the property owner, and the motorhome owner each testified as to the events of September 27, 2023. Gomez did not testify, nor did the other two individuals who were with him that day.

During closing arguments, Gomez's defense counsel returned to the dog analogy, and said:

> "And this is a circumstantial evidence case, guys. That's one reason why we learned about John the dog with the blue slushy. And this is the first time [the prosecutor] and I have had a trial—have put on a case for people before. And I really appreciated John the dog, with his blue tongue and the slushy.
>
> "But as I was watching the evidence getting put on about the case, I thought, well, wait a minute. We've got three dogs here. We've got John and Paul and Ringo. And all of them got blue tongues. . . . Maybe they all got in the slushy. Maybe there was some blue candy there. Maybe one of them thought it was okay to drink the slushy and was told it was okay to drink the slushy."

In response, the prosecutor argued:

> "[Defense counsel] is talking about three dogs. That's true. There are three dogs. That's why there's an allegation of conspiracy, and that's why there's the alternative theory of aiding and abetting. Because she's right. He was not the only one at the scene. That doesn't mean that he's any less culpable for the crimes committed."

5

## 2. Governing Law

"In enacting section 745 [commonly known as the RJA], the Legislature laudably declared its intention 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California. Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias. The intent of the Legislature is not to punish this type of bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system. It is the intent of the Legislature to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing. It is the intent of the Legislature to reject the conclusion that racial disparities within our criminal justice are inevitable, and to actively work to eradicate them.' (Stats. 2020, ch. 317, § 2, subd. (i).)" (*People v. Lashon* (2024) 98 Cal.App.5th 804, 809 (*Lashon*).)

To achieve this goal, section 745, subdivision (a) provides, as relevant here:

> "(a) The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of the evidence, any of the following:
>
> "(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin.
>
> "(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the

6

defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful."[1]

Section 745, subdivision (h)(4) defines " 'Racially discriminatory language' " for purposes of the statute to mean:

"[L]anguage that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."

Section 745, subdivision (b) provides the mechanism for defendants to raise RJA claims and, effective January 1, 2024, provides:

"A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a).  For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence.  The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section.  If the motion is based in whole or in part on conduct or statements by the judge, the judge shall disqualify themselves from any further proceedings under this section."

Because Gomez is raising his RJA claim for the first time on appeal, we review the trial record to determine whether he has established a violation of the RJA by a preponderance of the evidence.  (§ 745, subd. (a) [violations

---

[1]     Section 745, subdivision (a) includes two additional categories of RJA violations, not directly relevant here.

established "by a preponderance of the evidence"]; cf. *People v. Howard* (2024) 104 Cal.App.5th 625 (*Howard*) [applying de novo standard to the trial court's legal conclusion defendant failed to carry his burden of making a prima facie showing].)

### 3. Forfeiture

As Gomez concedes, he did not object to the use of the dog analogy in the trial court. As several courts of appeal have now held, where a defendant could have raised a Racial Justice Act claim below but failed to do so, the claim is forfeited. (See, e.g., *People v. Midell* (2025) 113 Cal.App.5th 1060, 1075–1076; *People v. Corbi* (2024) 106 Cal.App.5th 25, 38–43 (*Corbi*); *People v. Singh* (2024) 103 Cal.App.5th 76, 112–117 (*Singh*); *Lashon, supra,* 98 Cal.App.5th at pp. 810-816.)

Gomez acknowledges *Lashon, Singh*, and *Corbi*, but asserts that section 745, as amended by Assembly Bill No. 1118 (2023–2024 Reg. Sess., eff. Jan. 1, 2024), refers to direct appeals and therefore suggests that traditional forfeiture does not apply. In addition, Gomez asserts that this court should either exercise its discretion to review the merits of his claim, regardless of any forfeiture, or conclude that his trial counsel provided ineffective assistance of counsel by failing to object.

The court in *Lashon*, and the other cases that rely on it, considered the amendments set forth in Assembly Bill No. 1118 and nonetheless determined that while a defendant may raise an RJA claim for the first time on appeal, traditional rules of forfeiture still apply. (See, e.g., *Lashon, supra,* 98 Cal.App.5th at p. 812 [holding an RJA claim, "like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court"]; *Corbi, supra,* 106 Cal.App.5th 25, 43 ["the Legislature intended 'to ensure RJA

8

claims are processed more efficiently' "; agreeing with *Singh, supra,* 103 Cal.App.5th at p. 115, that " '[p]ermitting [an RJA] claim to be raised on direct appeal for the first time when it could have been timely raised and remedied below would be directly contrary to the goal of promoting judicial efficiency.' "].) We find that analysis persuasive and conclude that Gomez forfeited his claim in this case.

Regardless, as we explain next, we need not rely solely on forfeiture because even if we were to consider the merits of Gomez's assertions, we would not find that Gomez has established a violation of the RJA by a preponderance of the evidence. For these same reasons, we conclude Gomez has not established that his trial counsel provided ineffective assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 686–688 [to establish a claims for ineffective assistance of counsel, the appellant must show his attorney performed below the standard of reasonableness under prevailing professional norms and that there is a reasonable probability the result would have been more favorable to him but for that substandard performance].)

### 4.     Gomez Has Not Establish a Violation of the RJA

The RJA "defines ' "[r]acially discriminatory language" ' to include 'racially charged or racially coded language' and 'language that compares the defendant to an animal . . . .' (§ 745, subd., (h)(4).) Such language may explicitly or implicitly appeal to racial biases and inject racism and unfairness into a defendant's trial." (*People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077.)

"We recognize the extraordinary need to root out both explicit and implicit biases that infect the judicial system and that the RJA is an important tool to help achieve a more just judicial system." (*People*

*v. Coleman* (2024) 98 Cal.App.5th 709, 721.) We also acknowledge "that determining what does and what does not constitute the exhibition of 'bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful,' may be a difficult task." (*Ibid*.)

However, here, we conclude that the analogy to "John the dog" did not constitute racially discriminatory language. As noted, the prosecutor first raised the analogy during voir dire, with the aim of explaining the concept of circumstantial evidence to the jury. He then showed and described a picture of "John the dog," and asked the jury to imagine that they were "the owner of John" and that they had left him in the car alone with an ice cream slushy on a warm day, returning to find the slushy gone and John with a blue tongue.

The story painted an endearing picture of "John the dog," a pet that could hardly be blamed for drinking a cold slushy while alone in a car on a hot day. Later, the prosecutor referred to "John the dog" as extremely intelligent. None of this language was derogatory and none of it suggested that John was a bad actor or had negative character traits. Moreover, it was readily apparent to the prospective jurors that the prosecutor was using the dog analogy solely to explain the concept of circumstantial evidence. "John the dog" was seemingly culpable because of the empty cup and his blue tongue, not because he was a dog or because the jury was to conclude that dogs always steal slushies.

Likewise, when defense counsel later said there were "three dogs" in this case, she named them "John and Paul and Ringo," a readily identifiable reference to the Beatles, which most people would also recognize as positive or endearing as opposed to derogatory or menacing. The prosecutor then picked up that same language, agreeing that there were "three dogs" but explaining that the conspiracy allegations and aiding and abetting theory

10

could be used to assign culpability to all of them, even if the jury wasn't sure who "drank the slushy" or led the plan to steal the motorhome. Although the prosecutor did more directly compare the defendant to a dog, or dogs, in this singular comment, it was readily apparent to the objective observer, and the jury, that it was in the context of the state of the evidence, not anyone's character or inherent traits. Indeed, nothing in the prosecutor's remarks suggested that Gomez embodied any negative characteristic of dogs in general.

Gomez asserts that by referring to the dog, the prosecutor dehumanized him and his accomplices, whether intentionally or not. To the contrary, an objective observer would understand that the comparison between "John the dog" and the defendant here was a comparison about the state of the evidence. And, regardless, "John the dog" was not a threatening or otherwise problematic character. He was someone's pet whose only offense was eating a slushy the owner carelessly left in the car with him on a hot day.

Gomez relies on *People v. Hawkins* (1995) 10 Cal.4th 920 to assert a prosecutor's comparison of the defendant to a dog is inherently dehumanizing but the language at issue in *Hawkins* was significantly different. (See *Hawkins* at p. 961.) In *Hawkins*, the prosecutor referred to the "defendant as [being] 'coiled like a snake'" and "sentencing defendant to life in prison was compared to 'putting a rabid dog in the pound.'" (*Ibid.*) As our high court concluded, "this dehumanizing language improperly inflamed the jury's passions and further invited them to speculate on defendant's future conduct." (*Ibid.*) We do not reach the same conclusion when considering the prosecutor's statements about "John the dog" in this case.

To the extent Gomez asserts any reference that explicitly or implicitly compares a defendant to any animal is a facial violation of the RJA, we are not persuaded. We acknowledge that there is no shortage of animal references that are racially charged or coded, or that otherwise explicitly or implicitly appeal to racial bias. And thus, it is no surprise that the Legislature included comparisons to animals as one example in defining racially discriminatory language.

However, based on the plain language of section 745, subdivision (h)(4), the specific reference or comparison at issue must be language that "to an objective observer, explicitly or implicitly appeals to racial bias." (See *People v. Cochran* (2002) 28 Cal.4th 396, 400 [reviewing court "first look[s] at the plain and commonsense meaning of the statute because it is generally the most reliable indicator of legislative intent and purpose"].) As the People point out, there are numerous animal references in modern vernacular that are neither race-based nor derogatory (i.e., "busy bee," "eagle eyes," "night owl," "sweet as a kitten"). We do not believe the legislature intended to include such innocuous phrases in the definition of racially discriminatory language, simply based on any reference to any animal. As we have explained, here, "John the dog" was described as someone's pet, there was no suggestion he was aggressive or otherwise had a negative temperament, and the prosecutor referred to him as "extremely intelligent."

Gomez points out that, in its findings, the Legislature stated: "Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system." (Assem. Bill No. 2542, § 2, subd. (e).) It must be noted, though, that this statement came in the context of a discussion of "cases where prosecutors have compared defendants who are

12

people of color to Bengal tigers and other animals, even while acknowledging that such statements are 'highly offensive and inappropriate.' " (*Ibid*.)  To be clear, we agree that animal imagery can, and often is, used in a racially discriminatory manner.  We simply conclude that the references to "John the dog" in this case were benign.

We are also cognizant that the Legislature recently amended the RJA, and made additional findings and declarations, emphasizing, among other points, "the low threshold required to establish a prima facie showing under paragraphs (1) through (4) of subdivision (a) of the RJA."  (Assembly Bill No. 1071, Stats. 2025 ch. 721, eff. Jan. 1, 2026.)  Still, we conclude neither the prosecutor nor defense counsel exhibited racial bias or animus or used racially discriminatory language by comparing the evidence against Gomez to the blue tongued, extremely intelligent pet dog in the prosecutor's explanation of circumstantial evidence.  Nonetheless, we agree that counsel would be wise to use a different analogy in the future, such as to rain or to a sunrise, i.e., an analogy that does not utilize an animal.

For the foregoing reasons, we conclude that Gomez forfeited his claim under the RJA, and, even if he had not, he has not established a violation of the RJA by a preponderance of the evidence on appeal.  (See § 745, subd. (a) [violations established "by a preponderance of the evidence"]; *Howard, supra,* 104 Cal.App.5th at p. 625 [applying de novo standard].)

### B.    The Matter Must be Remanded for Resentencing

Gomez next asserts, and the People agree, that the matter must be remanded for resentencing for several reasons, including an inadequate record as to Gomez's prior convictions.

13

### 1. Additional Background

At the close of evidence, and prior to closing arguments, the trial court had the following exchange with trial counsel:

> "[Defense counsel]: So it is our request to have the priors bifurcated from the jury trial and for the Court to make the finding as a court bench trial *on any priors, the strikes or any prior convictions*, please.
>
> "THE COURT: Is that your agreement?
>
> "[Prosecutor]: Submit.
>
> "THE COURT: Very well. That's also your request, Counsel?
>
> "[Defense counsel]: Yes.
>
> "THE COURT: Then that will be bifurcated." (Italics added.)

After the jury returned their verdict, and at the outset of the sentencing hearing, the trial court inquired whether there would be a court trial on the priors. Counsel indicated that it was possible they would be able to stipulate and a discussion occurred on the record. The following exchange occurred at the conclusion of the discussion:

> "THE COURT: · So is he going to admit it or he was going to admit to the strike but he doesn't want to admit now?
>
> "[Defense counsel]: Mr. Gomez is willing for us to stipulate to the 2012 conviction of 186.22, that he did suffer that as a strike offense and thank you to stipulating with the People to just let the other two go.
>
> "THE COURT: So, Mr. Gomez, People have alleged three strikes, but if you admit the third, they're going to dismiss the other two. All right, sir. Then do you admit that on or about September 26, 2012, in the Superior Court of the State of California in and for the County of San Bernardino, that you—actually he pled on that one—you

14

were convicted or pled to a violation of Penal Code, Section 186.22, subdivision (a),a strike. Is that true, sir?

"Counsel, is that—

"[Defense counsel]: Yes.

"THE COURT: Is there a motion by the People as to the remaining strikes?

"[Prosecutor]: Yes.

"THE COURT: All right. Those will be dismissed."

The trial court then proceeded to discuss the aggravating factors and to sentence Gomez. There was no further discussion of the prior convictions, including those supporting the Penal Code section 666.5 allegation in count 1.

### 2.     The Sentence on Count 1 is Unauthorized

Gomez asserts the sentence on count 1 is unauthorized because no findings were ever made, either by the jury or the court, as to whether he was previously convicted of a qualifying prior vehicle theft offense within the meaning of Penal Code section 666.5, subdivision (a). We agree.

Penal Code section 666.5, subdivision (a) provides that a person convicted of a felony violation of Vehicle Code section 10851 who has been previously convicted of any of several enumerated sections of the Vehicle Code "shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three, or four years." (Pen. Code § 666.5, subd. (a).)

Here, the People alleged that Gomez had three strike priors, which were different offenses than those relied upon for the section 666.5 allegation in count 1. Gomez agreed to "have a court trial on the priors," but the parties agree that neither the court nor the parties ever addressed the prior convictions that the People relied on for the Penal Code section 666.5 allegation. Despite this, and without objection, the trial court sentenced Gomez to three years, doubled by a prior strike, for a term of six years on

15

count 1. In the absence of any findings on the allegation, the sentence is unauthorized and exceeded the court's jurisdiction. (Pen. Code § 1238, subd. (a)(10); *People v. Neal* (1993) 19 Cal.App.4th 1114, 1120.)

Gomez asserts the matters should be remanded for a *jury* trial and that he only agreed to a court trial on the prior strikes. The People contend remand should be for a court trial on the section 666.5 convictions because defense counsel made clear that Gomez was agreeing to a court trial on *all* prior convictions. We agree with the People's interpretation of the record. Counsel was clear that the waiver applied to all prior convictions, not just the strikes. Accordingly, we remand the matter for resentencing, to include a court trial on the allegation that Gomez was previously convicted of a qualifying prior vehicle theft offense within the meaning of Penal Code section 666.5, subdivision (a).

### 3. Gomez Did Not Personally Admit any Priors

Next, Gomez asserts the record does not reflect that he personally admitted the one strike prior, as required by the law. (See Pen. Code § 1018 ["every plea shall be entered or withdrawn by the defendant himself or herself in open court"]; *People v. Hofferber* (1977) 70 Cal.App.3d 265, 268.) We agree.

The trial court started to ask Gomez for the admission but then stopped and addressed defense counsel. Defense counsel confirmed that Gomez would admit the one strike prior, and the prosecutor moved to dismiss the remaining strikes. The minute order indicates Gomez admitted the prior strike, but we generally resolve conflicts between the reporter's and clerk's transcript in favor of the reporter's transcript. (See *In re Merrick V.* (2004) 122 Cal.App.4th 235, 249.)

This matter can be addressed on remand together with the court trial on the Penal Code section 666.5 convictions.

### 4. On Remand, the Trial Court Can Consider Whether the Sentence on Count 4 Should Have Been Stayed

Finally, Gomez asserts that, pursuant to Penal Code section 654, the trial court should have stayed the sentence on count 4, instead of running it concurrently.

A defendant may be charged with—and in some cases convicted of—multiple crimes arising out of the same conduct but cannot receive multiple punishments for the same act or omission. (§§ 654, 954; *People v. Reed* (2006) 38 Cal.4th 1224, 1226−1227.) Concurrent sentences based on one act or an indivisible course of conduct violate the rules against double punishment. (*People v. Jones* (2012) 54 Cal.4th 350, 353.)

Gomez asserts the chains and stabilizing bars referenced in count 4 were used to tow the motorhome, that any taking or receiving of them was part of one continuous act, and that the court therefore should have stayed the sentence on count 4. The People concede, and we agree, that the matter can be addressed on remand.

### III.   DISPOSITION

The matter is remanded to the trial court for resentencing, to include a court trial on the allegation that Gomez was previously convicted of a qualifying prior vehicle theft offense within the meaning of Penal Code section 666.5, subdivision (a), and further proceedings confirming Gomez's admission, or a court trial, on the prior strike conviction.  The judgment is affirmed in all other respects.

KELETY, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

18

Filed 2/4/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL DIAZ GOMEZ,<br><br>    Defendant and Appellant. | D086608<br><br>(Super. Ct. No. BLF2300203)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed January 28, 2026, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties